*321
On Application for Rehearing

BOLIN, Justice.
The opinion of September 11, 2009, is withdrawn, and the following opinion is substituted therefor.
The defendant, 1568 Montgomery Highway, Inc., d/b/a “Nancy’s Nook,” “Nancy’s Love Stuff,” and/or “Love Stuff’ (hereinafter “Love Stuff’), appeals from the trial court’s judgment upholding § 13A-12-200.2, Ala.Code 1975, against a constitutional challenge. We affirm.

Facts and Procedural History

On January 14, 2005, the City of Hoover (“Hoover”) sued Love Stuff in the Jefferson Circuit Court alleging that Love Stuff was an “adult-only enterprise” and that it had violated § 13A-12-200.5(4), Ala.Code 1975, a part of the Alabama Anti-Obscenity Enforcement Act, § 13A-12-200.1 et seq., Ala.Code 1975 (“the Act”), which had also been incorporated into the Hoover municipal code. Section 13A-12-200.5(4) provides:
“(4) It shall be unlawful for any person to operate an adult bookstore, adult movie house, adult video store, or other form of adult-only enterprise within 1,000 feet of a church, place of worship, church bookstore, public park, public housing project, daycare center, public or private school, college, recreation center, skating rink, video arcade, public swimming pool, private residence, or any other place frequented by minors. Any person who violates this subsection shall be guilty of a misdemeanor and, upon conviction, shall be punished by a fine of not more than ten thousand dollars ($10,000) and may also be imprisoned in the county jail for not more than one year.”
Hoover further alleged that Love Stuff is located within 1,000 feet of 2 places of worship, a day-care center, 2 playgrounds, 50 private residences, and 3 apartment complexes. Hoover sought a judgment declaring that Love Stuff was operating an “adult-only enterprise” within the meaning of the Act and that Love Stuff had violated § 13A-12-200.5(4) and the Hoover municipal code. It further alleged that the operation of the business constitutes a nuisance, and it sought an abatement of the nuisance.
On March 4, 2005, Hoover amended its complaint to add a count seeking a judgment declaring that Hoover would be in violation of the law if it granted Love Stuffs pending request for a sign permit. Hoover alleged that, because Love Stuff was operating in violation of § 13A-12-200.5(4), “the issuance of a sign permit by [Hoover] for an unlawful business would be a violation of the law.”
On March 9, 2005, Love Stuff filed an answer and asserted certain affirmative defenses; it also filed a counterclaim. Love Stuff contended that the term “other form of adult-only enterprise,” as set out in § 13A-12-200.5(4), was not defined in the Act and that the term was unconstitutionally vague and overly broad under the Alabama and United States Constitutions. Love Stuff “on behalf of itself and its customers” alleged in its counterclaim that the statutory ban on the sale of sexual aids at § 13A-12-200.2(a)(l) through (3) was a violation of the Ninth Amendment to the United States Constitution and Art. I, § 36, of the Alabama Constitution of 1901. Love Stuff adopted by reference the challenge to § 13A-12-200.2(a)(l) that had been filed by the plaintiffs in the federal court in Williams v. Pryor, No. 98-S-1938-NE.[1] Love Stuff also sought to com *322 pel the issuance of a sign permit. The Alabama Attorney General was notified of the constitutional challenge to the Act.
On June 30, 2005, Love Stuff filed a motion for a summary judgment on its counterclaims, asserting that the phrase “other form of adult-only enterprise” was unconstitutionally vague and overly broad; that the ban on sexual aids in § 13A-12-200.2 was unconstitutional; and that Hoover should be compelled to issue the sign permit. Hoover and the attorney general filed briefs in opposition to the motion. On September 27, 2005, the trial court denied the motion. With regard to Love Stuffs constitutional challenge to § 13A-12-200.2, the trial court stated:
“This Court therefore regards the challenge to Ala.Code [1975,] § 13A-12-200.2 as the same as that presented in the pending litigation before U.S. District Judge C. Lynwood Smith, Jr. Given the extensive history of that litigation, this Court defers a decision regarding the contours of any privacy/due process rights implicated by application of Ala. Code § 13A-12-200.2. We will wait to see what Judge Smith, and the Eleventh Circuit, decide on this issue.”
Following a bench trial, the trial court entered the following order on November 2, 2007:
“The trial of this case began on October 9, 2007, and continued for several days thereafter. The trial was on a non-jury basis, with the undersigned serving as the trier-of-fact. In that capacity, the undersigned had full opportunity to observe and gauge the credibility of those who testified. Many exhibits were admitted into evidence, moreover. Finally, the undersigned toured the premises of the business in question, accompanied by the court reporter, a videographer, and counsel for all parties. This order comes after consideration of all the evidence in this matter.

“Findings of Fact

“Since late 2004, the defendant, 1568 Montgomery Hwy., Inc., has operated a store within the city limits of Hoover. The defendant’s store is licensed as Nancy’s Nook, but is known more colloquially by its product name of ‘Love Stuff.’ The target market for Love Stuff consists of females, ages 32-52.
“Initially, Love Stuff admitted only those having a valid identification showing they were at least 18 years of age into the store. At some point thereafter, Love Stuff changed its policy and began admitting all customers into the store premises, instead restricting access to only a particular room (referred to as ‘Area B’ during the trial of this case) to those at least 18 years old. In Area B are items that this Court has no trouble characterizing as hard-core, adult-only material to which no child should be exposed. Area B constitutes from 26% to 29% of the sales space in Love Stuffs premises. The items in Area B constitute anywhere from 32% to 36% of Love Stuffs inventory, depending on whether one uses an average cost or a retail value basis for this determination.
“Accessible to all customers are the other rooms in which footwear and clothing (such as costumes, lingerie, and hosiery) and dress accessories are sold, along with magazines and books with adult content, and various lubricants, massage oils, and lotions, among other items. There are some items outside Area B that this Court might characterize as adult-only. Most, if not all, of the books for sale are unquestionably adult-only, for example, although the books (and magazines) are shrink-wrapped and therefore incapable of being reviewed *323 prior to purchase. During its tour, the Court occasionally wondered whether other items in Love Stuffs generally available displays weren’t better suited in Area B. Because there is no claim here that Love Stuff is violating Ala. Code [1975,] § 13A-12-200.2 or § 13A-12-200.5(2), however, this observation is immaterial to the Court’s adjudication of the merits, other than factoring into an analysis of what portion of the store’s products is unsuitable for minors.
“It is undisputed that Love Stuff is within 1,000 feet of churches, playgrounds, a daycare center, and private residences. Its location raises the issue of whether Love Stuff stands in violation of Ala.Code § 13A-12-200.5(4), discussed below. The Court does note, however, that Love Stuff operates out of a stand-alone building located on U.S. Highway 31. It is not in a mall or shopping center, and its location is not conducive to pedestrian traffic. According to trial testimony, the only children who come in are typically infants or very small toddlers brought by their parents who want to shop. Other than that, the Court can envision curious teenagers driving to Love Stuff as a destination spot.

“Love Stuff’s Expert Evidence

“During trial, the Court received, over the objections of the City of Hoover and the State of Alabama, the testimony of two expert witnesses called by Love Stuff, Dr. Rachel Maines and Dr. Theodore Cole. Dr. Maines testified concerning the history of various sexual devices, including the invention of certain devices by doctors in the 19th and early 20th centuries for use in treating diagnosed cases of hysteria in women. Dr. Cole, who until recently was licensed as a medical doctor, was allowed to testify concerning his work over many years with patients, both with and without disabilities, and the use of various sexual aids and devices in conjunction with conditions affecting healthy sexual functioning.
“At this juncture, it is necessary to address certain motions regarding these witnesses. The City of Hoover and the State first objected to the admission of their testimony on the grounds of relevance. That objection was overruled at trial because of possible relevancy to the defendant’s counterclaims, one of which focuses on Ala.Code § 13A-12-200.2. The City of Hoover and the State subsequently objected to the admission of Dr. Cole’s testimony because Dr. Cole was no longer a licensed doctor when he testified, having let his license lapse. The Court now overrules this objection, finding nothing outside the confines of medical malpractice litigation that would require a medical license in order for a physician to testify about his past experiences, and resulting expertise, as an expert under Rule 702 of the Alabama Rules of Evidence. In this regard, the Court finds that Ala.Code § 34-24-50, on which the City of Hoover and the State rely, is inapposite because Dr. Cole was not rendering any advice regarding the care and treatment of any particular patient.
“In any event, after considering the claims and issues in the case, the Court regards this expert testimony as being of little consequence. Ultimately, this testimony goes to support the view that •any sexual device or toy can, in particular cases, have some medical benefit.1 That just goes to say that any sexual device can, in a particular situation, have a medical purpose in assisting one who might otherwise encounter difficulties in his or her pursuit of a happy sex life. That same device, however, can also be used as a purely recreational toy to *324 spice up the sex life of one who has no significant physical or emotional difficulties in the bedroom. It is impossible to generally place these devices in one category or the other — it all depends on the individual using the device. The Court need not worry about this problem, for it does not impact adjudication of the specific claims raised by the parties in this action.

“Legal Analysis

“The City of Hoover raises claims seeking a declaratory judgment that Love Stuff is violating Ala.Code § 13A-12-200.5(4) and that it is therefore a public nuisance. Love Stuffs first counterclaim seeks a declaration that this statute is unconstitutionally vague. Ala. Code § 13A-12-200.5(4) provides the following:
“ ‘It shall be unlawful for any person to operate an adult bookstore, adult movie house, adult video store, or other form of adult-only enterprise within 1,000 feet of a church, place of worship, church bookstore, public park, public housing project, daycare center, public or private school, college, recreation center, skating rink, video arcade, public swimming pool, private residence, or any other place frequented by minors. Any person who violates this subsection shall be guilty of a misdemeanor and, upon conviction, shall be punished by a fine of not more than ten thousand dollars ($10,000) and may also be imprisoned in the county jail for not more than one year.’
“Throughout this case, counsel for the City of Hoover and for the State repeatedly characterized this case as a zoning dispute. For purposes of statutory construction, however, the Court must recognize that Ala. Code § 13A-12-200.5(4) is a criminal statute, with anyone found in violation thereof subject to prosecution for committing a misdemeanor. While Hoover and the State further argue that the Court should interpret this statute as it would any other statute, given that this is a civil case rather than a criminal prosecution, the Court disagrees. What matters is not the nature of the proceeding but the nature of the statute being scrutinized. Regardless of the claims at issue here, the Court finds that close scrutiny is required when interpreting a criminal statute. For this reason, this Court follows the rule of construction that ‘criminal statutes are to be strictly construed in favor of those persons sought to be subjected to their operation, i.e., defendants.’ Ex parte Bertram, 884 So.2d 889, 891 (Ala.2003), citing Schenher v. State, 38 Ala.App. 573, 90 So.2d 234 (1956).
“Ultimately, of course, the task is to figure out what the Alabama Legislature meant in enacting Ala.Code § 13A-12-200.5(4). As the Supreme Court has put it, ‘[t]he polestar of statutory construction is to ascertain and give effect to the Legislature’s intent in enacting a statute.’ Ex parte Berryhill, 801 So.2d 7, 10-11 (Ala.2001), quoting Norfolk S. Ry. v. Johnson, 740 So.2d 392, 396 (Ala.1999).
“With no dispute that Love Stuff is within 1,000 feet of churches, playgrounds and other areas frequented by minors, the crux here is whether Love Stuff is an ‘other form of adult-only enterprise,’ as set out in § 13A-12-200.5(4). In analyzing this issue, the Court first turns to another well-known merchant of Hoover, the Books-A-Million bookstore.
“Among the exhibits introduced at trial are a number of books and magazines that were acquired from the Hoover *325 Books-A-Million store. The books include those with the following titles:
“The Little Bit Naughty Book of Sex Toys
“Em and Lo’s Sex Toy
“K-I-S-S Guide to Sex
“Great Sex Tips
“Sex Play
“The Many Joys of Sex Toys
“XXX Sex ... Tonight
“Many of these books contain quite graphic discussion and accompanying photographs or illustrations of sexual conduct. Such publications should not be made available to children. The testimony was that these books are nevertheless in plain sight of all Books-A-Million customers, adult and children alike, with no effort made to shield them or prevent anyone from thumbing through them at that store.
“There is no contention, however, that Books-A-Million is an adult bookstore. Why? Because adult books such as those listed above constitute a very small percentage of Books-A-Million’s overall inventory. Under Ala.Code § 13A-12-200.1, an ‘adult bookstore’ is defined as a commercial establishment in which books or other medium depicting sexual conduct ‘constitute substantially all of its stock or inventory.’ While no one contends that a book superstore like Books-A-Million is an ‘adult bookstore,’ the problem is that the word ‘substantially’ is not defined. What if such books constituted 60% of a bookstore’s inventory — is that substantial enough to throw the business into this category? What about 40% or 20%? No guidance is given as to where to draw the line.
“The problem is compounded here because the parties agree that Love Stuff is to be categorized as an ‘other form of adult-only enterprise,’ as that term is found in Ala.Code § 13A-12-200.5(4). Unlike ‘adult bookstore,’ the term ‘other form of adult-only enterprise’ is not defined at all. In a prior order, this Court concluded that given the complete absence of a definition, the most logical way to define the term ‘other form of adult-only enterprise’ is to analogize to adult bookstores and video stores (which are defined terms), requiring the focus to be on the business’ [s] inventory (keeping in mind the inherent difficulty in determining what ‘substantially means).
“If Love Stuff did not have the items found in ‘Area B,’ the Court seriously doubts that there would be a dispute between the parties. The items in other parts of the store, while perhaps described by adjectives such as racy, suggestive or risque, do not rise to the level of ‘obscene,’ as that term is defined in Ala.Code § 13A-12-200.1. Further, most do not fall within the definition of items that are ‘harmful to minors,’ as also defined in that statute (although there may be a debate on that point with regard to a few items). Both of these defined terms appear to be carefully crafted in order to bring the statute into compliance with constitutional requirements. A provocative French Maid costume or some warming personal lubricant gel (also available at Wal-Mart, according to trial testimony) simply does not meet these definitions even though a parent might not desire such items displayed where his children can see them.
“As recognized above, the hard-core, adult items in Love Stuff constitute roughly 32% to 36% of its overall inventory. With that finding of fact, however, the Court has no way of knowing whether the Legislature intended for this percentage to constitute a substantial enough portion of inventory to permit *326 defining Love Stuff as an ‘other form of adult-only enterprise.’
“The City of Hoover and the State urge the Court to look at other factors, too. The Court does not know, however, if the Legislature intended for such other factors to form part of the calculation in defining this term. Should Love Stuffs advertising be examined? Even if it did so, the Court cannot conclude that such advertising emphasizes an adult-only business. There is no explicit mention of the term ‘Adult Only’ or of any well-known notation such as ‘XXX.’
“Should the Court look at the data on what percentage of floor space is devoted to unquestionably adult-only material? The answer — from 26% to 29%— offers no more guidance than the data on inventory.
“What about the fact that Love Stuff restricts access to Area B? That fact simply reflects that Love Stuff does offer for sale some adult-only merchandise and that Love Stuff takes steps to ensure that children are not exposed to the hard-core items (although it is open to debate whether some of the items in general display areas should also fall under this restriction).
“Hoover and the State further argue that Love Stuff is an adult-only enterprise because all items are for adults only, with nothing in the store intended to be sold for minors. This argument goes too far, however. The fact that shoes, for example, are sold in only adult sizes cannot be used to bring Love Stuff within the ‘adult-only enterprise’ definition any more than well-known and highly reputable clothing stores that cater to an adult clientele by offering only adult sizes.
“The Court now turns to Scott v. State, 917 So.2d 159 (Ala.Crim.App.2005), in which the Court of Criminal Appeals examined at some length the void-for-vagueness doctrine involving claims against another section of the Alabama Obscenity Enforcement Act. The appellant there unsuccessfully argued that Ala.Code § 13A-12-200.il was void for vagueness because the terms ‘business establishment,’ ‘for entertainment purposes,’ and ‘allow’ are not specifically defined in that statute, and the statute does not mention obscenity.2
“In Scott, the Court of Criminal Appeals recognized the void-for-vagueness doctrine as follows:
“ ‘As generally stated, the void-for-vagueness doctrine requires that a penal statute define the criminal offense with sufficient definiteness that ordinary people can understand what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement.... A statute challenged for vagueness must therefore be scrutinized to determine whether it provides both fair notice to the public that certain conduct is proscribed and minimal guidelines to aid officials in the enforcement of that proscription....’
“[917] So.2d at 170-71 (citations omitted).
“After recognizing that not every ambiguity rises to the level of a constitutional infirmity, the Scott court then provided the following guidance:
“ ‘The judicial power to declare a statute void for vagueness “should be exercised only when a statute is so incomplete, so irreconcilably conflicting, or so vague or indefinite, that it cannot be executed, and the court is unable, by the application of known and accepted rules of construction, to determine, with any reasonable degree of certainty, what the legislature *327 intended.” Jansen v. State ex rel. Downing, 273 Ala. 166, 170, 137 So.2d 47, 50 (1962).’
“Id. at 171-72 (citation omitted).
“If Ala.Code § 13A-12-200.il were implicated here, as it was in the Seott decision, the task would be an easy one. One may readily conclude, for example, that an adult club in which nude women entertain patrons by pole-dancing falls afoul of this law. The matter here is more complex, however. While Love Stuff clearly sells a number of items that are for adults only, this Court lacks any standards to decide whether it is an ‘other form of adult-only enterprise.’
“For these reasons, the Court must conclude that Ala.Code § 13A-12-200.5(4) is too vague to pass constitutional muster. That being so, the City of Hoover cannot rely upon it to have Love Stuff declared a public nuisance.
“In its • second counterclaim, Love Stuff asks to have Ala.Code § 13A-12-200.2 (which generally bans the sale of sex toys) deemed unconstitutional. This provision of the Alabama Code was held to be constitutional in Williams v. Morgan, 478 F.3d 1316 (11th Cir.2007), which decision the U.S. Supreme Court has recently declined to review. This Court finds no basis to hold to the contrary, and further finds that the statute withstands any argument of unconstitutionality under the Alabama Constitution.
“Finally, the parties joust over the issue of a sign permit. The City of Hoover’s third claim seeks a declaration that it has no obligation to issue a permit given that Love Stuff stands in violation of the Alabama Code and Hoover’s local ordinance. In response, Love Stuffs third counterclaim seeks an order directing the City of Hoover to issue such a permit. It appears that the only reason to deny Love Stuff a sign permit is if it were violating the law, since it has already obtained, and currently maintains, a business license. Based on the above rulings, however, this Court cannot find that Love Stuff is in violation of any enforceable law. Love Stuffs counterclaim with respect to a sign permit is therefore due to be granted.

“Conclusion

“This Court does not take issue with the general proposition that zoning restrictions may take into account factors such as public safety, morals and general welfare. Ala. Code § 13A-12-200.5(4) is not a zoning regulation, however; it is a criminal statute. Nor does this Court deny that the State may generally proscribe as illegal activities deemed obscene or harmful to the children of this State. Efforts to do so, however, must be with precision and clarity in order to accomplish the desired goals while recognizing every citizen’s constitutional right to know what conduct is deemed criminal.
“This Court neither condones nor condemns Love Stuffs business operations. Instead, this Court here emphasizes that every criminal statute of this State must be crafted with care to avoid the uncertainties that can give rise to arbitrary and discriminatory enforcement. The following is therefore ORDERED:
“1. The term ‘other form of adult-only enterprise,’ as found in Ala.Code § 13A-12-200.5(4) is hereby deemed unconstitutionally vague. For this reason, judgment in favor of the defendant must be entered on the City of Hoover’s claim seeking a declaration that the defendant is violating the statute (and Hoover’s municipal ordinance 11-31). Further, judgment is entered in favor of the defendant on the City of Hoover’s second claim seeking to enjoin the defendant *328 from operating as a public nuisance. The City of Hoover is entitled to no relief under these claims.
“2. Judgment is hereby entered in favor of the City of Hoover and the State of Alabama on the defendant’s counterclaim seeking to have Ala.Code § 13A-12-200.2 declared unconstitutional.
“3. The defendant is entitled to the relief sought in its third counterclaim, and the City of Hoover is ordered to promptly undertake steps necessary for issuing a sign permit to the defendant.
“4. This order concludes this litigation. Costs taxed as paid.
ul The court has no problem recognizing that while sex toys are often used recreationally, they can assist people suffering from physical disabilities or other conditions, emotional or psychological, that can impair sexual functioning. The Court also has no problem concluding that a healthy sex life can contribute to an adult’s overall health and happiness. (In this regard, the Court notes with interest the very recent decision of Janda v. Janda, 984 So.2d 434 (Ala.Civ.App.2007), in which the Court of Civil Appeals affirmed the trial court’s order annulling a marriage because of the complete absence of sexual relations between husband and wife; in doing so, the Court of Civil Appeals relied on California precedent recognizing that sexual relations is an essential aspect of the very existence of a marriage.)
“2Ala.Code § 13A-12-200.il provides the following: ‘It shall be unlawful for any business establishment or any private club to show or allow to be shown for entertainment purposes the human male or female genitals, pubic ai-ea, or buttocks with less than a fully opaque covering, or the showing of the female breast with less than a fully opaque covering of any portion thereof below the top of the nipple, or the depiction of covered male genitals in a discernibly turgid state. A violation of this section shall be a Class C Felony.’ ”
Love Stuff filed a motion to alter, amend, or vacate the judgment insofar as it held that § 13A-12-200.2, Ala.Code 1975, was not unconstitutional or, in the alternative, for a new trial. The trial court denied the motions. Love Stuff appealed.

Issues

Love Stuff argues that this Court should revisit the issue whether § 13A-12-200.2, Ala.Code 1975, is unconstitutional under the United States Constitution following the reasoning of Reliable Consultants, Inc. v. Earle, 517 F.3d 738 (5th Cir.2008), and rejecting the reasoning of and the ultimate conclusion reached by the United States Court of Appeals for the Eleventh Circuit in Williams v. Morgan, 478 F.3d 1316 (11th Cir.2007), which upheld § 13A-12-200.2 against a constitutional challenge. Love Stuff also argues that the statutory ban on the sale of sexual aids found at § 13A-12-200.2, Ala.Code 1975, is unconstitutional under Art. I, § 36, Ala. Const. 1901, or, in the alternative, that § 13A-12-200.2 violates the separation-of-powers doctrine in Art. Ill, § 43, Ala. Const.1901.

Standard of Review

“ ‘Our review of constitutional challenges to legislative enactments is de novo.’ Richards v. Izzi, 819 So.2d 25, 29 n. 3 (Ala.2001). Additionally, acts of the legislature are presumed constitutional. State v. Alabama Mun. Ins. Corp., 730 So.2d 107, 110 (Ala.1998). See also Dobbs v. Shelby County Econ. & Indus. Dev. Auth., 749 So.2d 425, 428 (Ala.1999) (‘In reviewing the constitutionality of a legislative act, this Court *329 will sustain the act “ ‘unless it is clear beyond reasonable doubt that it is viola-tive of the fundamental law.’ ” White v. Reynolds Metals Co., 558 So.2d 373, 383 (Ala.1989) (quoting Alabama State Fed’n of Labor v. McAdory, 246 Ala. 1, 9, 18 So.2d 810, 815 (1944)).’). We approach the question of the constitutionality of a legislative act ‘ “ ‘with every presumption and intendment in favor of its validity, and seek to sustain rather than strike down the enactment of a coordinate branch of the government.’ ” ’ Monroe v. Harco, Inc., 762 So.2d 828, 831 (Ala.2000). (quoting Moore v. Mobile Infirmary Ass’n, 592 So.2d 156, 159 (Ala.1991), quoting in turn McAdory, 246 Ala. at 9, 18 So.2d at 815).
“Moreover, in order to overcome the presumption of constitutionality, ... the party asserting the unconstitutionality of the Act ... bears the burden ‘to show that [the Act] is not constitutional.’ Board of Trustees of Employees’ Retirement Sys. of Montgomery v. Talley, 291 Ala. 307, 310, 280 So.2d 553, 556 (1973). See also Thorn v. Jefferson County, 375 So.2d 780, 787 (Ala.1979)(‘It is the law, of course, that a party attacking a statute has the burden of overcoming the presumption of constitutionality....’).”
State ex rel. King v. Morton, 955 So.2d 1012, 1017 (Ala.2006).

Discussion

I. Does § 13A-12-200.2, Ala.Code 1975, violate the United States Constitution?

Love Stuff argues that a protected liberty interest is involved and that the right claimed, although not equal to a fundamental right, is deserving of greater protection than would be afforded under traditional rational-basis review. It argues that this protected-liberty-interest analysis would require a balancing between Alabama’s interests in protecting its citizens and the liberty interest of those engaging in consensual, private sexual conduct using sexual devices. Love Stuff contends that the rights of Alabamians to sell and to use sexual devices should prevail over Alabama’s purported interest in public morality consistent with the opinion of the United States Court of Appeals for the Fifth Circuit in Reliable Consultants, Inc. v. Earle, supra.
The Alabama Attorney General and Hoover (hereinafter referred to collectively as “the State”) have filed a joint brief in this Court. The State asserts that the trial court, applying the reasoning of the decision of the Eleventh Circuit Court of Appeals in Williams v. Morgan, supra, properly found that § 13A-12-200.2, Ala. Code 1975, did not violate the United States Constitution. The State argues that the Supreme Court in Lawrence v. Texas, 539 U.S. 558, 123 S.Ct. 2472, 156 L.Ed.2d 508 (2003), did not create a new fundamental right to sexual privacy and that § 13A-12-200.2 has as its rational bases public morality and furthering the public welfare. The State argues that this Court should find Williams v. Morgan persuasive and reject the Fifth Circuit Court of Appeals’ opinion in Reliable Consultants.
Because of the way the parties have framed the federal constitutional issues, a detailed discussion of Williams and Reliable Consultants is necessary. This includes a discussion of how both courts of appeals have interpreted the United States Supreme Court’s case of Lawrence v. Texas.
In 1998, the Alabama Legislature amended the state’s obscenity laws to criminalize the distribution of “any device designed or marketed as useful primarily for the stimulation of human genital organs for any thing of pecuniary value.” *330 § 13A-12-200.2(a)(l). In adopting the amendments, the legislature stated its purpose in Section 1 of Act No. 98-467:
“(1) That in order to protect children from exposure to obscenity, prevent assaults on the sensibilities of unwilling adults by the purveyor[s] of obscene material, and suppress the proliferation of ‘adult-only video stores,’ ‘adult bookstores,’ ‘adult movie houses,’ and ‘adult-only entertainment,’ the sale and dissemination of obscene material should be regulated without impinging on the First Amendment rights of free speech by erecting barriers to open display of erotic and lascivious material.”
Act No. 98-467, Ala. Acts 1998.
Vendors of sexual devices and persons who use such devices challenged the constitutionality of § 13A-12-200.2(a)(l) in federal court. Williams v. Pryor, 41 F.Supp.2d 1257 (N.D.Ala.1999). One of the vendors/plaintiffs operated a store that sold sexual devices and novelties. According to facts stipulated to at trial, some customers use the products to avoid sexually transmitted diseases; some use the products to enhance their personal relationships; some use the products to achieve sexual satisfaction because they are unable to do so otherwise; some use the products for satisfaction when their partner is not available; and some are referred to the store by a therapist as treatment for sexual dysfunction or marital problems. 41 F.Supp.2d at 1262-63. The other vendor/plaintiff sold sexual devices to women through “Tupperware-style” parties. 41 F.Supp.2d at 1260. The users/plaintiffs were four women who each asserted that the sexual devices were for therapeutic purposes related to sexual dysfunction or an alternative to sexual intercourse. Id. The plaintiffs claimed that § 13A-12-200.2 infringed upon their fundamental right to privacy under a striet-scrutiny analysis. In the alternative, they argued that § 13A-12-200.2 did not pass constitutional muster under a rational-basis review. Id.
The parties in Williams v. Pryor stipulated to certain facts that are relevant here: Section 13A-12-200.2 makes it a crime to sell or distribute “any device designed or marketed as primarily useful for the stimulation of human genital organs for any thing of pecuniary value.” 41 F.Supp.2d at 1265. To obtain sexual aids in Alabama under the current law, one will have to obtain them in another state and bring them across state lines. The text of the Act does not define sexual devices as “obscene” as that term is defined in the Act. Alabama law does not prosecute masturbation or other stimulation of the genitals, even when performed with a sexual aid. Rather, it is the sale of the sexual device, and not the use of it, that is proscribed under § 13A-12-200.2. 41 F.Supp.2d at 1265. Several Alabama bookstores open to the general public sell books describing the use of vibrators or sexual aids. 41 F.Supp.2d at 1267. Also, Spencer’s Gifts retail store, located in shopping malls in Huntsville, sells vibrators. 41 F.Supp.2d at 1269. Virility drugs are available in Alabama. 41 F.Supp.2d at 1265. Ribbed or tickler condoms are manufactured in Alabama and sold throughout the state. Id.
With regard to their right-to-privacy claim, the plaintiffs in Williams v. Pryor argued that the enforcement of § 13A-12-200.2 would “impose an undue burden on their ‘fundamental rights of privacy and personal autonomy guaranteed by the First, Fourth, Fifth, Ninth[,] and Fourteenth Amendments of the United States Constitution.’ ” 41 F.Supp.2d at 1274 (quoting the plaintiffs’ memorandum). The plaintiffs argued that “their right of privacy and personal autonomy constitutes *331 a ‘liberty interest’ protected by the Due Process Clause of the Fourteenth Amendment.” 41 F.Supp.2d at 1274. The court noted that if the challenged legislation involves a fundamental right then the legislation is subject to strict judicial scrutiny and if the challenged legislation does not burden a fundamental right then the legislation faces only minimal scrutiny.
The plaintiffs framed the issue as “whether the right to privacy ‘is broad enough to encompass an individual’s decision to engage in private sexual activity not proscribed by law’ the attorney general described the issue as “ ‘whether there is a constitutional right to obtain dildos, vibrators, and other marital aids “designed and marketed as useful primarily for the stimulation of human genital organs.”’” 41 F.Supp.2d at 1275. The court determined that the issue was not as broad as the plaintiffs suggested nor as narrow as the attorney general defined it. Instead, the federal district court stated the issue as “whether the concept of constitutionally protected ‘right to privacy’ protects an individual’s liberty to use devices ‘designed or marketed as useful primarily for the stimulation of human genital organs’ when engaging in lawful, private, sexual activity.” 41 F.Supp.2d at 1275.
The federal district court in Williams v. Pryor determined that the Fourteenth Amendment to the United States Constitution did not cover the plaintiffs’ request to extend the privacy right the Supreme Court has recognized as fundamental. 41 F.Supp.2d at 1281-88. “The Supreme Court simply has placed the bar too high to allow recognition of an individual’s use of devices ‘designed or marketed as useful primarily for the stimulation of human genital organs’ as a fundamental liberty interest.” 41 F.Supp.2d at 1283-84. The federal district court focused on the use, rather than the distribution, of the proscribed devices, because “if the use of such devices is a fundamental liberty interest as plaintiffs contend, then the legislature’s ban on distribution compels strict judicial scrutiny.” 41 F.Supp.2d at 1281. The court looked to the holdings in two Supreme Court cases it says “elucidate the fact that any significance of the distinction between prohibitions of commercial use versus private use depends on the protection the Constitution affords the target material or conduct.” 41 F.Supp.2d at 1281 n. 30. In Paris Adult Theatre I v. Slaton, 413 U.S. 49, 66, 93 S.Ct. 2628, 37 L.Ed.2d 446 (1973), the Supreme Court held that,
“[i]f obscene material unprotected by the First Amendment in itself carried with it a ‘penumbra’ of constitutionally protected privacy, this Court would not have found it necessary to decide Stanley [v. Georgia, 394 U.S. 557 (1969),] on the narrow basis of the ‘privacy of the home,’ which was hardly more than a reaffirmation that ‘a man’s home is his castle.’ ”
In Carey v. Population Services, International, 431 U.S. 678, 687-88, 97 S.Ct. 2010, 52 L.Ed.2d 675 (1977), the Supreme Court held that
“[r]estrictions on the distribution of contraceptives clearly burden the freedom to make [protected childbearing] decisions....
“... [T]he same test must be applied to state regulations that burden an individual’s right to decide to prevent conception or terminate pregnancy by substantially limiting access to the means of effectuating that decision as is applied to state statutes that prohibit the decision entirely.... This is so ... because such access is essential to exercise of the constitutionally protected right of decisions in matters of childbearing.”
*332 The federal district court noted that the plaintiffs’ most persuasive argument that use of such devices is a fundamental liberty interest stemmed from the therapeutic and medical uses of the devices for individuals afflicted with sexual dysfunction. The court stated:
“The appeal of this argument notwithstanding, based on the Supreme Court’s focus on history and tradition, the Supreme Court’s express reluctance to extend the protection of the Due Process Clause, its narrow readings of cases recognizing liberty interests as fundamental, and its statements that it has not yet decided a case squarely on point, this court refuses to extend the fundamental right of privacy to protect plaintiffs’ interest in using devices ‘designed or marketed as useful primarily for the stimulation of human genital organs’ when engaging in lawful, private, sexual activity, and thereby impose a strict scrutiny frame of analysis when reviewing the Alabama statute at issue.”
41 F.Supp.2d at 1284.
The federal district court went on to address whether § 13A-12-200.2(a)(l) would survive review under the rational-basis test and ultimately concluded that § 13A-12-200.2 failed rational-basis review. The court noted that the legislature stated that its purpose in adopting the Act was to protect children from exposure to obscenity, to prevent unwilling adults from assaults on their sensibilities by the sellers of obscene material, and to suppress the proliferation of adult-only businesses. The federal district court concluded, based on the pleadings, motions, briefs, oral arguments, and independent judicial research, that the state’s interest in enacting the Act could also have been:
“(1) the belief that ‘[t]he commerce of sexual stimulation and auto-eroticism, for its own sake, unrelated to marriage, procreation or familial relationships is an evil, an obscenity ... detrimental to the health and morality of the state’ (Brief of Alabama Attorney General, at 21); or (2) the desire to ban commerce in all ‘obscene’ material.”
41 F.Supp.2d at 1286 (footnote omitted). The federal district court found that although the state’s interests were legitimate, the prohibition on selling or distributing devices designed for the stimulation of human genital organs was not rationally related to those legitimate state interests. The district court stated that “[ijnnumera-ble measures far short of an absolute ban on the distribution of sexual devices would accomplish the State’s goals.” 41 F.Supp.2d at 1288. The federal district court noted that the “Tupperware-style” parties were not public and that the other vendor’s displays could be modified. In support of its reasoning, the district court cited Romer v. Evans, 517 U.S. 620, 116 S.Ct. 1620, 134 L.Ed.2d 855 (1996) (holding that an amendment to a state constitution failed rational-basis review under the Equal Protection Clause because the breadth of the amendment was too far removed from the state’s legitimate interests), Turner v. Safley, 482 U.S. 78, 91, 107 S.Ct. 2254, 96 L.Ed.2d 64 (1987)(holding that the asserted state interests “[did] not satisfy the reasonable relationship standard, but rather constitute^] an exaggerated response to [its] ... concerns”), and City of Cleburne v. Cleburne Living Ctr., 473 U.S. 432, 105 S.Ct. 3249, 87 L.Ed.2d 313 (1985) (holding a zoning ordinance unconstitutional under rational-basis review).
The federal district court in Williams v. Pryor went on to state that § 13A-12-200.2 was not rationally related to the state’s interest in discouraging “sexual stimulation and auto-eroticism, for its own sake, unrelated to marriage, procreation or familial relationships,” because “such a ban *333 inevitably interferes with sexual stimulation and auto-eroticism which is related to marriage, procreation, and familial relationships.” 41 F.Supp.2d at 1289. The court noted that some customers of the vendors/plaintiffs have used the devices upon the suggestion of a therapist and that others have used the devices to achieve a more satisfactory relationship with their marital partners. The court stated that two undisputed experts in the field of human sexuality opined that the devices were effective, if not vital, to treating married couples’ difficulties and that the Food and Drug Administration recognizes the therapeutic value of the devices for treating sexual dysfunction.
The state appealed, and the United States Court of Appeals for the Eleventh Circuit reversed the decision of the federal district court. Williams v. Pryor, 240 F.3d 944 (11th Cir.2001)(Williams II”). The Eleventh Circuit panel reviewing the decision first considered the district court’s holding that § 13A-12-200.2 was unconstitutional because it failed rational-basis scrutiny. The Eleventh Circuit discussed the highly deferential standard of rational-basis review that proscribes only the very outer limits of a legislature’s power, stating: “A statute is constitutional under rational basis scrutiny so long as ‘there is any reasonably conceivable state of facts that could provide a rational basis for the’ statute.” 240 F.3d at 948 (quoting FCC v. Beach Commc’ns, Inc., 508 U.S. 307, 314, 113 S.Ct. 2096, 124 L.Ed.2d 211 (1993)). The Eleventh Circuit concluded that the district court had erred in determining that § 13A-12-200.2 lacked a rational basis, because the state has an interest in safeguarding public morality. The federal appellate court held that the criminal proscription on the distribution of sexual devices in § 13A-12-200.2 was a rational means for making the acquisition and use of the devices more difficult. “[Ijncremen-tal steps are not a defect in legislation under rational basis scrutiny, so Alabama did not act irrationally by prohibiting only the commercial distribution of sexual devices, rather than prohibiting their possession or use or by directly proscribing masturbation with or without a sexual device.” 240 F.3d at 950.
The Eleventh Circuit Court of Appeals concluded that Romer v. Evans, supra, Turner v. Safley, supra, and City of Cleburne, supra, were distinguishable and thus did not support the federal district court’s decision. Specifically, the Eleventh Circuit stated that Turner was distinguishable in that Turner concerned inmates and did not “concern[] the constitutional protection accorded by ordinary rational basis scrutiny to citizens in free society.” 240 F.3d at 950. According to the court, Rom-er was distinguishable because in Romer the state had no legitimate interest in passing the challenged legislation. Last, City of Cleburne was distinguishable in that it involved an Equal Protection Clause analysis and not a fundamental-rights challenge like the challenge raised by the plaintiffs in Williams.
The Eleventh Circuit then went on to address the district court’s fundamental-rights analysis, concluding that the district court correctly rejected the facial challenge, but the Eleventh Circuit remanded the case for reconsideration of the “as-applied fundamental rights challenges raised by the plaintiffs ... for due consideration by the district court because the record and stipulations in this case simply are too narrow to permit us to decide whether or to what extent the Alabama statute infringes a fundamental right to sexual privacy of the specific plaintiffs in this case.” 240 F.3d at 955.
On remand, the federal district court struck down § 13A-12-200.2, holding that *334 the statute unconstitutionally burdened the right to use sexual devices within private, consensual adult sexual relationships. Williams v. Pryor, 220 F.Supp.2d 1257 (N.D.Ala.2002) (“Williams III ”). The district court concluded on remand that the “prohibition of the sale of sexual devices imposes a significant burden on the right of married and unmarried persons to sexual privacy, in that it severely limits their ability to access, and thus to use, sexual devices within their sexual relationships.” 220 F.Supp.2d at 1298. The district court, based on what the Eleventh Circuit referred to as “a fundamental right to sexual privacy of the specific plaintiffs in this case,” Williams II, 240 F.3d at 955, defined the plaintiffs’ liberty interest as the “right to sexual privacy.” 220 F.Supp.2d at 1277. After discussing the history and legal traditions regarding sexual privacy between married persons and the historical right to sexual privacy afforded to unmarried adults, the federal district court concluded that there was a fundamental right to sexual privacy that encompasses the right to use sexual devices. The court applied a strict-scrutiny analysis to § 13A-12-200.2 and found that the statute failed the strict-scrutiny analysis because the statute “imposes a significant burden on the right of married and unmarried persons to sexual privacy, in that it severely limits their ability to access, and thus to use, sexual devices within their sexual relationships.” 220 F.Supp.2d at 1298.
The state appealed, and a different panel of the United States Court of Appeals for the Eleventh Circuit, in Williams v. Attorney General of Alabama, 378 F.3d 1232 (11th Cir.2004) (“Williams IV”), held that there was no fundamental, substantive due-process right of consenting adults to engage in private sexual conduct that would trigger a strict-scrutiny review of all infringements of that right, and it declined to recognize a new fundamental right to sexual privacy and remanded the case for further proceedings consistent with its opinion. In so holding, the Eleventh Circuit determined that Lawrence v. Texas, 539 U.S. 558, 123 S.Ct. 2472, 156 L.Ed.2d 508,[2] decided after the federal district court had issued its decision in Williams III, did not recognize a fundamental right to sexual privacy. The Eleventh Circuit Court of Appeals advised that on remand the district court “may examine whether our holding in Williams II that Alabama’s law has a rational basis (e.g., public morality) remains good law” after Lawrence v. Texas overruled Bowers v. Hardwick, 478 U.S. 186, 106 S.Ct. 2841, 92 L.Ed.2d 140 (1986). 378 F.3d at 1238 n. 9.
On second remand, the district court in Williams v. King, 420 F.Supp.2d 1224, 1250 (N.D.Ala.2006) (“Williams V”), held that § 13A-12-200.2 could be upheld on public-morality grounds, under a rational-basis analysis. The district court acknowledged that the language of the United States Supreme Court in Lawrence v. Texas, which indicated that a state’s view of a “ ‘particular practice as immoral is not a sufficient reason for upholding a law prohibiting the practice.’ ” 420 F.Supp.2d at 1247 (quoting Bowers v. Hardwick, 478 U.S. at 216, 106 S.Ct. 2841 (Stevens, J., dissenting)). However, the district court, 420 F.Supp.2d at 1248, concluded that the Eleventh Circuit had continued to uphold the viability of public morality as a rational basis for legislation after Lawrence v. Texas, stating that “[t]o hold that public morality can never serve as a rational basis for legislation after Lawrence would *335 cause a ‘massive disruption of the current social order.’ ” 420 F.Supp.2d at 1249-50 (quoting Lawrence v. Texas, 539 U.S. at 591, 123 S.Ct. 2472 (Scalia, J., dissenting)). The district court stated that it was unwilling to set in motion such a disruption of the current social order. Instead, the district court considered whether Lawrence, as applied to § 13A-12-200.2, was sufficient to strike down the statute. The district court reasoned that the criminalization of certain homosexual acts in Lawrence reinforced a “vicious cycle of distancing and stigma that preserve[d] the equilibrium of oppression” among societal groups. 420 F.Supp.2d at 1250. The district court determined that because Lawrence concerned the criminalization of homosexual acts that were the subject of the “vicious cycle of distancing and stigma” the Supreme Court did not want to reinforce, Lawrence did not benefit the Williams plaintiffs. The court stated:
“If this is a correct interpretation of the majority’s decision in Lawrence, it does not benefit plaintiffs in the present case. As the stipulated facts show, Alabama’s ban on the sale of sexual devices affects diffuse categories of people: men and women; married as well as unmarried. None have been identified in the stipulated facts as ‘gays,’ ‘lesbians,’ or any other ‘discrete and insular’ class of individuals. Moreover, none of the devices have been characterized as implements that are common to a homosexual lifestyle. Consequently, it cannot plausibly be argued that the law has targeted a specific class of individuals for discrimination or harm out of simple hostility. Stated somewhat differently, the Alabama statute, unlike the Texas anti-same-sex-sodomy statute at issue in Lawrence, neither directly nor indirectly burdens an identifiable group in such a way that a class of stigmatized individuals emerges.
“In addition, this case simply is different from Lawrence. The Lawrence majority was careful to define the scope of its holding, stating:
“ ‘The present case does not involve minors. It does not involve persons who might be injured or coerced or who are situated in relationships where consent might not easily be refused. It does not involve public conduct or prostitution. It does not involve whether the government must give formal recognition to any relationship that homosexual persons seek to enter. The case does involve two adults who, with full and mutual consent from each other, engaged in sexual practices common to a homosexual lifestyle. The petitioners are entitled to respect for their private lives. The State cannot demean their existence or control their destiny by making their private sexual conduct a crime. Their right to liberty under the Due Process Clause gives them the full right to engage in their conduct without intervention of the government. “It is a promise of the Constitution that there is a realm of personal liberty which the government may not enter.” The Texas statute furthers no legitimate state interest which can justify its intrusion into the personal and private life of the individual.’
“Lawrence, 539 U.S. at 578, 123 S.Ct. 2472 (quoting (Planned Parenthood of Southeastern Pennsylvania v.] Casey, 505 U.S. [833] at 847, 112 S.Ct. 2791 [(1992)]).
“In contrast, the activities prohibited by the Alabama law at issue here are not limited to private sexual conduct, or to any other activities occurring solely within the private lives of consenting adults. Instead, the activities prohibited by the law could very well be exposed to *336 the public in general, including to minors. As the Williams TV majority recognized, the differences between this case and Lawrence are significant.”
420 F.Supp.2d at 1253. The plaintiffs again appealed.
In Williams v. Morgan, 478 F.3d 1316 (11th Cir.2007) (“Williams VI ”), the Eleventh Circuit Court of Appeals affirmed the decision of the federal district court. After observing that the Texas statute struck down in Lawrence criminalized private sexual conduct, the Eleventh Circuit distinguished the Alabama statute on the ground that it forbade only public commercial activity. 478 F.3d at 1322. The court stated:
“The challenged statute does not target possession, use, or even the gratuitous distribution of sexual devices. In fact, plaintiffs here continue to possess and use such devices. States have traditionally had the authority to regulate commercial activity they deem harmful to the public. See, e.g., Ohralik v. Ohio State Bar Ass’n, 436 U.S. 447, 456, 98 S.Ct. 1912, 1919, 56 L.Ed.2d 444 (1978) (‘[T]he State does not lose its power to regulate commercial activity deemed harmful to the public whenever speech is a component of that activity.’). Thus, while public morality was an insufficient government interest to sustain the Texas sodomy statute, because the challenged statute in this case does not target private activity, but public, commercial activity, the state’s interest in promoting and preserving public morality remains a sufficient rational basis.”
478 F.3d at 1322-23.
Determining that, post-Lawrence, a state may still regulate commercial activity if the state determines that the commercial activity is harmful to the public, the Eleventh Circuit Court of Appeals held that Alabama’s interest in “promoting and preserving public morality” remained a sufficient rational basis for upholding § 13A-12-200.2. 478 F.3d at 1322-23. The court stated:
“[W]e do not read Lawrence, the overruling of Bowers, or the Lawrence court’s reliance on Justice Stevens’s dissent, to have rendered public morality altogether illegitimate as a rational basis. The principle that ‘[t]he law ... is constantly based on notions of morality,’ Bowers, 478 U.S. at 196, 106 S.Ct. at 2846, was not announced for the first time in Bowers and remains in force today. As we noted in Williams IV, the Supreme Court has affirmed on repeated occasions that laws can be based on moral judgments. Williams IV, 378 F.3d at 1238 n. 8; see Barnes [v. Glen Theatre, Inc.], 501 U.S. [560] at 569, 111 S.Ct. [2456] at 2462 [ (1991) ] (upholding a public indecency statute, stating, ‘[t]his and other public indecency statutes were designed to protect morals and public order. The traditional police power of the States is defined as the authority to provide for the public health, safety, and morals, and we have upheld such a basis for legislation.’); id. (noting that ‘a legislature could legitimately act ... to protect “the social interest in order and morality” ’); Gregg v. Georgia, 428 U.S. 153, 183, 96 S.Ct. 2909, 2930, 49 L.Ed.2d 859 (1976) (upholding the death penalty, noting that ‘capital punishment is an expression of society’s moral outrage at particularly offensive conduct’); Paris Adult Theatre I [v. Slaton], 413 U.S. [49] at 61, 93 S.Ct. [2628] at 2637 [ (1973) ] (holding that Georgia had a legitimate interest in regulating obscene material because the legislature ‘could legitimately act ... to protect “the social interest in order and morality” ’) (quoting Roth [v. United States], 354 *337 U.S. [476] at 485, 77 S.Ct. [1304] at 1309 [ (1957) ]); United States v. Bass, 404 U.S. 336, 348, 92 S.Ct. 515, 522, 30 L.Ed.2d 488 (1971) (noting that ‘criminal punishment usually represents the moral condemnation of the community’).
“Also, we have discussed the post-Lawrence viability of public morality as a rational basis for legislation with approval. See Lofton v. Sec’y of the Dept. of Children and Family Servs., 358 F.3d 804, 819 n. 17 (2004). In Lofton, upholding a law prohibiting homosexual couples from adopting, we indicated that public morality likely remains a constitutionally rational basis for legislation:
“ ‘Florida also asserts that the statute is rationally related to its interest in promoting public morality both in the context of child rearing and in the context of determining which types of households should be accorded legal recognition as families. Appellants respond that public morality cannot serve as a legitimate state interest.... [I]t is unnecessary for us to resolve the question. We do note, however, the Supreme Court’s conclusion that there is not only a legitimate interest, but a substantial government interest in protecting order and morality, and its observation that [i]n a democratic society legislatures, not courts, are constituted to respond to the will and consequently the moral values of the people.’
“Id., 358 F.3d at 819 n. 17 (internal quotations and citations omitted). We have also noted: ‘One would expect the Supreme Court to be manifestly more specific and articulate than it was in Lawence if now such a traditional and significant jurisprudential principal has been jettisoned wholesale....’ Williams IV, 378 F.3d at 1238 n. 8.
“Accordingly, we find that public morality survives as a rational basis for legislation even after Lawrence, and we find that in this case the State’s interest in the preservation of public morality remains a rational basis for the challenged statute. By upholding the statute, we do not endorse the judgment of the Alabama legislature. As we stated in William $ II:
“ ‘However misguided the legislature of Alabama may have been in enacting the statute challenged in this case, the statute is not constitutionally irrational under rational basis scrutiny because it is rationally related to the State’s legitimate power to protect its view of public morality. “The Constitution presumes that ... improvident decisions will eventually be rectified by the democratic process and that judicial intervention is generally unwarranted no matter how unwisely we may think a political branch has acted.” Vance v. Bradley, 440 U.S. 93, 97, 99 S.Ct. 939, 942-43, 59 L.Ed.2d 171 (1979). This Court does not invalidate bad or foolish policies, only unconstitutional ones; we may not “sit as a super-legislature to judge the wisdom or desirability of legislative policy determinations made in areas that neither affect fundamental rights nor proceed along suspect lines.” New Orleans v. Dukes, 427 U.S. 297, 303, 96 S.Ct. 2513, 2517, 49 L.Ed.2d 511 (1976).’
“Williams II, 240 F.3d at 952.

“CONCLUSION

“For the foregoing reasons, we reaffirm our holding in Williams II that the challenged statute is constitutional and we affirm the judgment of the district court.”
478 F.3d at 1323-24.
In Reliable Consultants, Inc. v. Earle, 517 F.3d 738, the United States Court of *338 Appeals for the Fifth Circuit addressed a constitutional challenge to a Texas statute that made it illegal to sell, advertise, give, or lend a device designed or marketed for sexual stimulation unless the defendant could prove that the device was sold, advertised, given, or lent for a statutorily defined purpose, i.e., a bona fide medical, psychiatric, judicial, legislative, or law-enforcement purpose. The Texas statute does not prohibit the use or possession of sexual devices.
The plaintiffs in Reliable Consultants were retail-store operators who sold sexual devices for off-premises use. They argued that the statute violated the Fourteenth Amendment because, they argued, it infringed upon an individual’s right to engage in private intimate conduct in the home without governmental intrusion. The State of Texas argued that the plaintiffs, who sold sexual devices for profit, could not assert the individual rights of their customers. The Fifth Circuit Court of Appeals held that the state’s argument failed because of previous Supreme Court precedent, citing Griswold v. Connecticut, 381 U.S. 479, 85 S.Ct. 1678, 14 L.Ed.2d 510 (1965), which invalidated a ban on the use of contraceptives. In Griswold, the Supreme Court recognized that the plaintiffs, who were pharmacists, had standing to raise the constitutional rights of the married people whom they served. The Fifth Circuit also noted that other cases have held that businesses can assert the rights of their customers and that restricting the ability to purchase an item is tantamount to restricting the use of the item.
In addressing which constitutional standard to apply, the Fifth Circuit first looked to the right that was at stake. The plaintiffs argued that the right at stake was an individual’s substantive due-process right to engage in private intimate conduct free from governmental intrusion; the state defined the right narrowly as the “ ‘right to stimulate one’s genitals for non-medical purposes unrelated to procreation or outside of an interpersonal relationship.’ ” 517 F.3d at 743. The Fifth Circuit noted that the State of Texas defined the right as narrowly as did Alabama in Williams IV. The Fifth Circuit stated that it was guided by the Supreme Court’s decision in Lawrence v. Texas, supra, and construed the constitutional right at stake as the right “to be free from governmental intrusion regarding ‘the most private human [conduct], sexual behavior.’ ” 517 F.3d at 744 (quoting Lawrence, 539 U.S. at 567, 123 S.Ct. 2472). The Fifth Circuit construed Lawrence as follows: “Lawrence is properly understood to explain the contours of the substantive due process right to sexual intimacy.” 517 F.3d at 744. The Fifth Circuit recognized that “Laurrence did not categorize the right to sexual privacy as a fundamental right, and we do not purport to do so here.” 517 F.3d at 745 n. 32. The Fifth Circuit held:
“Because of Laurrence, the issue before us is whether the Texas statute impermissibly burdens the individual’s substantive due process right to engage in private intimate conduct of his or her choosing. Contrary to the district court’s conclusion, we hold that the Texas law burdens this constitutional right. An individual who wants to legally use a safe sexual device during private intimate moments alone or with another is unable to legally purchase a device in Texas, which heavily burdens a constitutional right. This conclusion is consistent with the decisions in Carey [v. Population Services, International, 431 U.S. 678 (1977),] and Griswold, where the Court held that restricting commercial transactions unconstitutionally burdened the exercise of individual rights. Indeed, under this statute it is even illegal to ‘lend’ or ‘give’ a sexual device to *339 another person. This further restricts the exercise of the constitutional right to engage in private intimate conduct in the home free from government intrusion. It also undercuts any argument that the statute only affects public conduct.”
517 F.3d at 744 (footnote omitted).
In reaching its holding in Reliable Consultants, the Fifth Circuit Court of Appeals examined all of Texas’s asserted governmental interests in connection with the statute. The Fifth Circuit stated:
“The State’s primary justifications for the statute are ‘morality based.’ The asserted interests include ‘discouraging prurient interests in autonomous sex and the pursuit of sexual gratification unrelated to procreation and prohibiting the commercial sale of sex.’
“These interests in ‘public morality’ cannot constitutionally sustain the statute after Lawrence. To uphold the statute would be to ignore the holding in Lawrence and allow the government to burden consensual private intimate conduct simply by deeming it morally offensive. In Lawrence, Texas’s only argument was that the anti-sodomy law reflected the moral judgment of the legislature. The Court expressly rejected the State’s rationale by adopting Justice Stevens’ view in Bowers as ‘controlling’ and quoting Justice Stevens’ statement that ‘ “the fact that the governing majority in a State has traditionally viewed a particular practice as immoral is not a sufficient reason for upholding a law prohibiting the practice.’” Thus, if in Lawrence public morality was an insufficient justification for a law that restricted ‘adult consensual intimacy in the home,’ then public morality also cannot serve as a rational basis for Texas’s statute, which also regulates private sexual intimacy.
“Perhaps recognizing that public morality is an insufficient justification for the statute after Lawrence, the State asserts that an interest the statute serves is the ‘protection of minors and unwilling adults from exposure to sexual devices and their advertisement.’ It is undeniable that the government has a compelling interest in protecting children from improper sexual expression. However, the State’s generalized concern for children does not justify such a heavy-handed restriction on the exercise of a constitutionally protected individual right. Ultimately, because we can divine no rational connection between the statute and the protection of children, and because the State offers none, we cannot sustain the law under this justification.
“The alleged governmental interest in protecting ‘unwilling adults’ from exposure to sexual devices is even less convincing. The Court has consistently refused to burden individual rights out of concern for the protection of ‘unwilling recipients.’ Furthermore, this asserted interest bears no rational relation to the restriction on sales of sexual devices because an adult cannot buy a sexual device without making the affirmative decision to visit a store and make the purchase.
“The State argues that if this statute, which proscribes the distribution of sexual devices, is struck down, it is equivalent to extending substantive due process protection to the ‘commercial sale of sex.’ Not so. The sale of a device that an individual may choose to use during intimate conduct with a partner in the home is not the ‘sale of sex’ (prostitution). Following the State’s logic, the sale of contraceptives would be equivalent to the sale of sex because contraceptives are intended to be used *340 for the pursuit of sexual gratification unrelated to procreation. This argument cannot be accepted as a justification to limit the sale of contraceptives. The comparison highlights why the focus of our analysis is on the burden the statute puts on the individual’s right to make private decisions about consensual intimate conduct. Furthermore, there are justifications for criminalizing prostitution other than public morality, including promoting public safety and preventing injury and coercion.
“Just as in Lawrence, the State here wants to use its laws to enforce a public moral code by restricting private intimate conduct. The case is not about public sex. It is not about controlling commerce in sex. It is about controlling what people do in the privacy of their own homes because the State is morally opposed to a certain type of consensual private intimate conduct. This is an insufficient justification for the statute after Lawrence.
“It follows that the Texas statute cannot define sexual devices themselves as obscene and prohibit their sale. Nothing here said or held protects the public display of material that is obscene as defined by the Supreme Court — i.e., the language in Section 43.21(a)(1) of this statute, excluding the words in the provision defining as obscene any device designed or marketed for sexual stimulation. Whatever one might think or believe about the use of these devices, government interference with their personal and private use violates the Constitution.”
517 F.3d at 745-47 (footnotes omitted). The Fifth Circuit concluded that the asserted governmental interests in enacting and upholding the law do not meet the applicable constitutional standard announced in Lawrence v. Texas.
It is clear from the discussions in Williams VI and Reliable Consultants that the debate about the scope of Lawrence v. Texas remains open. See also United States v. Extreme Assocs., Inc., 431 F.3d 150 (3d Cir.2005) (upholding a federal statute that regulated the distribution of obscenity). This is so because the Supreme Court based its holding in Lawrence on the “exercise of ... liberty under the Due Process Clause of the Fourteenth Amendment,” 539 U.S. at 564, 123 S.Ct. 2472, and did not apply the two-step analysis applicable to fundamental rights articulated in Washington v. Glucksberg, 521 U.S. 702, 117 S.Ct. 2258, 138 L.Ed.2d 772 (1997).[3] In sum, the Fifth Circuit interpreted Lawrence broadly, and the Eleventh Circuit interpreted it narrowly. It is the Eleventh Circuit’s view of Lawrence that we embrace.
*341 In adopting the Eleventh Circuit Court of Appeals’ interpretation of Lawrence and that court’s subsequent holding that public morality supplies a legitimate rational basis for the statute, we note the following: The Court of Appeals for the Eleventh Circuit recognized that the statute in Lawrence criminalized private sexual activity while the Alabama statute prohibits public, commercial activity. Section 13A-12-200.2 does not prohibit the personal use of or “the gratuitous distribution” of sexual devices. Williams VI, 478 F.3d at 1322. The Eleventh Circuit did not interpret Lawrence as eliminating public morality as a rational basis for determining the constitutionality of legislation. Although the court recognized that to the extent that Lawrence rejected public morality as a legitimate governmental interest, it invalidated only those laws that involved both private and noncommercial activity. Section 13A-12-200.2 involves public commercial activity, not the regulation of private sexual conduct. Also, the Texas statute in Lawrence involved a discrete class of individuals targeted for discrimination out of simple hostility, where no such class is targeted in the Alabama statute. The Eleventh Circuit did not “endorse the judgment” of the Alabama Legislature in enacting a statute banning the sale of sexual devices, but it left it to the citizens of this state to rectify, in its view, any improvident legislation through the democratic process.
Based on the foregoing, we hold that § 13A-12-200.2, Ala.Code 1975, does not violate the Due Process Clause of the United States Constitution.
II. Does § 13A-12-200.2 violate the Alabama Constitution of 1901?
Love Stuff argues that § 13A-12-200.2, Ala.Code 1975, violates the Alabama Constitution under this Court’s reasoning in State v. Lupo, 984 So.2d 395 (Ala.2007). Specifically, Love Stuff argues that, in addition to the rights enumerated under the Federal Constitution, Alabamians have certain additional rights under the Alabama Constitution and that Lupo explored the rights of Alabamians to contract with persons of their choice “where expressive activity is involved.” Love Stuffs brief, p. 22. Love Stuff also argues that certain terms used in the general ban of the sale of sex toys in § 13A-12-200.2 are so vague as to be void under the Alabama Constitution. Last, Love Stuff argues that the statute violates the separation-of-powers provisions of the Alabama Constitution.
In Lupo, supra, the State Board of Registration for Interior Design (“the Board”) sued Diane Lupo, an interior decorator, alleging that she had violated the Alabama Interior Design Consumer Protection Act by practicing “interior design” without registering with the Board. Lupo denied the allegations and asserted that the act was unconstitutional because, she argued, it was overly broad and deprived her of her liberty interest in violation of due process. In 1982, the legislature had passed an act to regulate the practice of interior design, which provided that only those persons who complied with the registration procedures under the act could hold themselves out as “interior designers.” The 1982 act did not prohibit individuals from engaging in the practice of interior design; it merely restricted the use of the title “interior designer.” In 2001, the legislature repealed the 1982 act and adopted a new act, which regulated the practice of interior design by restricting the practice to only those individuals who had been certified by the Board. In 2002, the Board sued Lupo. Following a bench trial, the trial court held that the act was unconstitutional in that it was “overly broad, unreasonable and vague.” The Board appealed, and this Court held that the act *342 was unconstitutionally overbroad and that, because the unconstitutional provisions of the act were “‘so intertwined with the remaining portions’ of the [a]ct,” 984 So.2d at 407, they could not be severed. Specifically, we held that the act imposed restrictions that were unnecessary and unreasonable upon the pursuit of useful activities; that those restrictions did not bear a substantial relation to the public health, safety, or morals, or to the general welfare, the public convenience, or to the general prosperity; and that, therefore, the act was unconstitutionally overbroad under Art. I, §§ 6 and 13, of the Alabama Constitution of 1901.
Love Stuff relies primarily on Justice Parker’s special concurrence in Lupo, supra, in which he wrote:
“The framers of the Alabama Constitution of 1901 protected economic liberties and other liberties in the Due Process Clause of Art. I, § 6 (‘[He] shall not ... be deprived of life, liberty, or property, except by due process of law), using language similar to the Due Process Clauses of the Fifth and Fourteenth Amendments to the United States Constitution. But they also protected economic liberties by adopting Art. I, § 1 (‘That all men are equally free and independent; that they are endowed by their Creator with certain inalienable rights; that among these are life, liberty and the pursuit of happiness.’), § 13 (‘That all courts shall be open; and that every person, for any injury done to him, in his lands, goods, person, and reputation, shall have a remedy by due process of law; and right and justice shall be administered without sale, denial, or delay.’), § 22 (‘That no ... law, impairing the obligations of contracts ... shall be passed by the legislature ....’), § 23 (‘private property shall not be taken for, or applied to public use, unless just compensation be first made therefor; nor shall private property be taken for private use, or for the use of corporations, other than municipal, without the consent of the owner,’ thereby providing protection that goes beyond those found in the ‘takings’ clause of the Fifth Amendment to the United States Constitution), § 35 (‘That [the] sole object and only legitimate end of government is to protect the citizen in the enjoyment of life, liberty, and property, and when the government assumes other functions it is usurpation and oppression.’), and § 36 (‘That this enumeration of certain rights shall not impair or deny others retained by the people; and, to guard against any encroachments on the rights herein retained, we declare that everything in this Declaration of Rights is excepted out of the general powers of government, and shall forever remain inviolate.’).”
984 So.2d at 408-09. Love Stuff notes that Justice Parker’s special concurrence includes a summation of constitutional provisions granting rights to Alabamians and, specifically, that his writing includes a summation of Art. I, § 36, on which Love Stuff relied in its counterclaim.
We note that “[s]ection 36 erects a firewall between the Declaration of Rights that precedes it and the general powers of government, including the authority to exercise judicial power, that follow it.” Ex parte Cranman, 792 So.2d 392, 401 (Ala.2000). Sections 1 through 35 of Article I set out basic and fundamental rights guaranteed to all Alabamians, and § 36 provides that no branch of government has the authority to impair or deny those rights. Section 6 ensures that no Alabamian will be deprived of life, liberty, or property without due process of law.
In its brief, Love Stuff argues that § 13A-12-200.2 violates § 35 (“that the *343 sole object and only legitimate end of government is to protect the citizen in the enjoyment of life, liberty, and property....”) • Love Stuff argues that the general ban on the sale of sexual devices limits not only its right to sell the devices, but also the rights of citizens to contract with vendors like Love Stuff in purchasing sexual devices for their private use. Love Stuff contends that this Court in Lupo, supra, clarified Alabama’s interest in protecting commercial activity. Love Stuff argues that if the legislature could create an exception to the registration requirement for interior designers for incidental design assistance made in conjunction with a retail sale, which this Court in Lupo extended to nonregistered interior designers, then it should be permissible to sell sexual devices not only for “medical, scientific, educational, legislative, judicial, or law enforcement purposes,” Williams III, 220 F.Supp.2d at 1268 n. 47, but also for personal reasons.
We note that the statute does not forbid the possession or use of sexual devices, regardless of the reason for their use. Also, § 13A-12-200.2(a)(l) provides that “[i]t shall be unlawful for any person to knowingly distribute, possess with intent to distribute, or offer or agree to distribute any obscene material or any device designed or marketed as useful primarily for the stimulation of human genital organs for any thing of pecuniary value”; thus, the sale of certain devices, such as massag-ers that are not primarily marketed or designed for sexual use, is allowed, even if consumers use the devices primarily for a sexual purpose. Even so, Love Stuff argues that prohibiting the ability of an Alabama citizen to purchase from an Alabama vendor sexual devices for personal use violates a citizen’s right to pursue happiness. Love Stuff relies on Lupo, supra, in which the restriction on interior decorators was an unnecessary and unreasonable limitation upon the pursuit of useful activities and the restriction did not bear a substantial relation to the public health, safety, or morals, or to the general welfare, the public convenience, or the general prosperity. The State argues that the statute can be upheld if the restriction on the sale of sexual devices for personal use serves a public interest important enough to justify the restriction on the right to happiness. The State further argues that a citizen’s right to happiness is not without limits and that the restriction on the sale of sexual devices is grounded in the shared morality of the people as set out in the laws enacted by their elected representatives.
The right addressed in Lupo was the right to pursue the opportunity to work and to make a living, and this Court determined that the legislature’s restriction on that right was not related to any public interest. The act at issue in Lupo broadly defined interior design to include the selection of decorative accessories and paint colors, and it regulated those activities when they were not related to a retail sale, which, in turn, restricted, without a valid reason, an interior decorator’s right to provide services. In the present case, the legislature’s restraint on the sale of sexual devices does not constitute an unreasonable restraint upon the inalienable right to pursue happiness or the right to contract in a field that involves expressive activity; the restriction in the statute is justified as an exercise of the State’s police power. It is well settled that the State may enact reasonable regulations for the promotion of public safety, health, and morals and generally for public welfare. The State contends that it has a general welfare interest in protecting minors and unwilling adults from exposure to sexual devices. Restricting the sale of sexual devices does not, as Love Stuff argues, place “unreasonable burdens on the commercial and collat *344 erally affected personal choices of the people of Alabama.”
Next, in addition to arguing that the phrase “other form of adult-only enterprise” in § 13A-12-200.5(4), Ala.Code 1975, is so vague as to render the statute void, Love Stuff also contends that § 13A-12-200.2 (which generally bans the sale of sex toys) is rendered void because certain undefined terms used in the statute such as “device,” “stimulation,” and “human genital organs,” are too vague.[4] The State contends that Love Stuff did not properly raise a “void-for-vagueness” argument with regard to § 13A-12-200.2 before the trial court. We note that the trial court’s order did not specifically address this argument.
In response to the State’s contention that Love Stuff did not raise the argument below, Love Stuff states in its reply brief that the State was placed on notice of Love Stuffs void-for-vagueness challenge to § 13A-12-200.2 by the following statement in its pleading:
“Wherefore, to the extent that Hoover’s complaint implicates § 13A-12-200.2, Code of Alabama 1975, with respect to [Love Stuffs] business and purchases made by its customers, either alone or in conjunction with the attempted application of § 13A-12-200.5(4), Code of Alabama, 1975, [Love Stuff] seeks a declaration by this Court pursuant to § 6-6-223, Code of Alabama, 1975, both facially and as applied by Hoover in this cause, both standing alone and by reference in Section 11-31 of the Municipal Code of the City of Hoover, Alabama, is unconstitutional under both the Alabama and United States Constitutions.”
Love Stuff also states that it argued in its summary-judgment motion that § 13A-12-200.2 violated the Alabama Constitution.
We disagree with Love Stuffs contention that the State was placed on notice that § 13A-12-200.2 “could likewise be challenged in the same manner as § 13A-12-200.5(4) as unconstitutionally vague and overbroad.” (Love Stuffs reply brief, p. 7.) Nothing in Love Stuffs complaint alleges that the undefined terms used in § 13A-12-200.2 were vague, nor does Love Stuff make that argument in its summary-judgment motion. Love Stuffs bare hint that § 13A-12-200.2 could be challenged as unconstitutionally vague in the same manner as it was challenging § 13A-12-200.5(4) was insufficient to the put the State on notice of Love Stuffs challenge.
It is well settled that an issue cannot be raised for the first time on appeal.
“The rule is well settled that a constitutional issue must be raised at the trial level and that the trial court must be given an opportunity to rule on the issue, or some objection must be made to the failure of the court to issue a ruling, in order to properly preserve that issue for appellate review. This Court succinctly stated this rule as follows:
“ Tn order for an appellate court to review a constitutional issue, that issue must have been raised by the appellant and presented to and reviewed by the trial court. Additionally, in order to challenge the constitutionality of a statute, an appellant must identify and make specific argu- *345 merits regarding what specific rights it claims have been violated.’
“Alabama Power Co. v. Tuner, 575 So.2d 551 (Ala.1991) (citations omitted.)”
Cooley v. Knapp, 607 So.2d 146, 148 (Ala.1992).
Last, Love Stuff argues that the statute violates the separation-of-powers provisions of the Alabama Constitution of 1901 set out in Art. Ill, §§ 42 and 43. Love Stuff asserts that it should have been allowed to present evidence at the bench trial showing that the 1998 amendments to the obscenity laws regarding the sale of sexual devices were suggested to the sponsor of the bill proposing the amendments and drafted by a district attorney. Love Stuff argues that the district attorney, as a member of the executive branch of government, should not engage in legislative activities.
We note that sources of ideas for legislation can vary greatly:
“A legislator may read a newspaper account of a problem. A constituent may bring a problem to the legislator’s attention. A state employee may suggest a change in the law that would allow the agency to manage the people’s business better. A public official may have a political agenda to implement through legislation. An organization, such as the National Conference of Commissioners on Uniform State Laws, may offer ideas. In some cases, ... the legislature has created a group specifically to develop ideas for legislation. In every case, however, an idea can become a law only through, the efforts of a person or an entity who has the authority to convert the idea into a bill for the legislature to consider. That stage of the process involves sponsorship.”
Gregory Chainov, How an Idea Really Becomes Law, 36 Willamette L.Rev. 185, 187 (2000)(footnotes omitted).
The source of the idea that is the impetus for proposed legislation does not implicate the separation-of-powers provisions. As the State noted in its brief, the sponsor of a proposed bill may suggest changes in addition to changes suggested by the Legislative Reference Service or by legal counsel. Also, other legislators may amend a bill in both houses of the legislature. Public hearings are held. The governor may veto the bill and send it back to the legislature with suggested changes. “The motives or reasons of an individual legislator are not relevant to the intent of the full legislature in passing the bill.” Eagerton v. Terra Res., Inc., 426 So.2d 807, 809 (Ala.1982). In James v. Todd, 267 Ala. 495, 103 So.2d 19 (1958), the trial court refused to allow members of the legislature to testify concerning their motive and purpose or the intent of the legislature in passing the act. In affirming the judgment of the trial court, this Court stated: “ ‘It is of course a well settled rule that in determining the validity of an enactment, the judiciary will not inquire into the motives or reasons of the legislature or the members thereof.... “The judicial department cannot control legislative discretion, nor inquire into the motives of legislators.” ’ ” 267 Ala. at 506, 103 So.2d at 28 (quoting Morgan County v. Edmonson, 238 Ala. 522, 525, 192 So. 274, 276 (1939)).
Accordingly, Love Stuff has failed to show that § 13A-12-200.2 violates the Alabama Constitution.

Conclusion

To summarize, in rejecting Love Stuffs federal constitutional challenge to § 13A-12-200.2, we agree with the interpretation given Lawrence v. Texas by the United States Court of Appeals for the Eleventh Circuit. Post-Lawrence, public morality can still serve as a legitimate rational basis for regulating commercial activity, which is *346 not a private activity. As the Eleventh Circuit in Williams IV stated: “There is nothing ‘private’ or ‘consensual’ about the advertising and sale of a dildo. And such advertising and sale is just as likely to be exhibited to children as to ‘consenting adults.’ ” 378 F.3d at 1237 n. 8. In rejecting Love Stuffs state constitutional challenge, we hold that Love Stuff failed to show that the statute violated the Alabama Constitution.
APPLICATION GRANTED; OPINION OF SEPTEMBER 11, 2009, WITHDRAWN; OPINION SUBSTITUTED; AFFIRMED.
LYONS, STUART, SMITH, PARKER, MURDOCK, and SHAW, JJ., concur.
COBB, C.J., and WOODALL, J., dissent.

. The initial decision by the federal district court in this extended litigation is published at 41 F.Supp.2d 1257 (N.D.Ala.1999). This line of litigation is discussed infra.

. Lawrence v. Texas struck down a Texas statute making it a crime for two persons of the same sex to engage in certain intimate sexual conduct in the privacy of a home as impinging on their exercise of liberty interests protected by the Due Process Clause.

. In Glucksberg, the petitioners challenged the State of Washington's ban on assisted suicide as patently unconstitutional because, they argued, it violated the " 'liberty to choose how to die.’" 521 U.S. at 722, 117 S.Ct. 2258 (quoting brief of respondents). The Supreme Court defined the issue as "whether the 'liberty' specially protected by the Due Process Clause includes a right to commit suicide which itself includes a right to assistance in doing so” and concluded that the right to assisted suicide was not a fundamental liberty interest. 521 U.S. at 723, 117 S.Ct. 2258. In its determination, the Supreme Court drew from its established method of substantive due-process analysis and articulated a two-step analysis: First, in analyzing a request for a new fundamental right, the Court must look at a "careful description" of the asserted right and, second, the Court must examine whether the asserted right is one of "those fundamental rights and liberties which are, objectively, 'deeply rooted in this Nation's history and tradition,' ... and 'implicit in the concept of ordered liberty,' such that 'neither liberty nor justice would exist if they were sacrificed.' " 521 U.S. at 720-21, 117 S.Ct. 2258.

. Section 13A-12-200.5(4) provides that it is unlawful for any person to operate adult bookstores, adult movie houses, adult video stores, "or other form of adult-only enterprise" within 1,000 feet of certain establishments like schools and churches. The trial court concluded that tire phrase "other form of adult-only enterprise” was so vague as to be unconstitutional.